UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VASILY SIDOROV,

Plaintiff,

-against-

KONSTANTIN MALKOV, GARMAL, LLC,
CLOUD DADDY, INC., JOHN T. KELLY,
MAXIM SMETANNIKOV, MVG, LLC and
YURIY KOZHYNOV

Defendants.

---

COMPLAINT

21-cv-_____ (___)

Plaintiff Demands
Trial by Jury

---

Plaintiff Vasily Sidorov, by his attorneys, Scarola Zubatov Schaffzin PLLC, as and

for his Complaint herein, alleges as follows:

*The Nature of the Action*

1.       This action for fraudulent inducement and/or omission, negligent

misrepresentation and/or omission, breach of fiduciary duty, breach of contract, unjust enrichment,

for a declaratory judgment and for specific performance arises from an egregious course of action in

which plaintiff Vasily Sidorov was induced by defendants Konstantin Malkov and Maxim

Smetannikov to invest on entirely false pretenses in Mr. Malkov's startup entity, Cloud Daddy LLC,

which was in the business of providing secure backup and disaster recovery for cloud data storage.

Mr. Sidorov was misinformed on every level: he was given misinformation about the market-

readiness of the company's technology, led to believe, falsely, that it was an existing business with

satisfied customers and utterly misinformed about the financial contributions of — and per-share

prices paid by — others who had invested and who would invest at the same time as his own

intended investment would be paid in, as well as led to believe that that he would be executing a

shareholders agreement that would impose certain material obligations upon other investors but which, in fact, on information and belief, was never intended to be presented — and was not presented — to them for execution. On the basis of such misinformation, he invested $200,000 in Cloud Daddy in December 2017 / January 2018.

2.      This round of investment was followed by a further round of investment in November-December 2018, in which Mr. Sidorov was again solicited by Mr. Malkov and company attorney John T. Kelly on entirely false pretenses. Among other things, Mr. Sidorov was falsely told that the company would be receiving an additional $2.1 million in investment when the actual number to be contributed was known to be substantially smaller and was falsely told he needed to invest an additional $252,000 to avoid dilution of his interest in the company. On the basis of such misinformation, he invested another $252,000 in the company in November-December 2018.

3.      He discovered substantially later that, among other things, two investors who were initially supposed to be investing $486,000 in Cloud Daddy as part of this second round of investment had been permitted to invest at a later date at a substantially lower per-share price, a transaction the terms of which were deliberately concealed from him and which was permitted to take place, in plain violation of his contractual and other rights, without his knowledge and consent.

4.      Over time, he discovered, moreover, that, among other things, Cloud Daddy was, in fact, little more than a product — and, moreover, a product not nearly as polished and unique as he had been led to believe. It hardly had any sales or customers and was being utterly mismanaged by Mr. Malkov, who had spent much of its capital in an opaque manner on undocumented or inadequately documented product development work and who, instead of working diligently to build the business and product of Cloud Daddy, was working full-time at another entity while running Cloud Daddy as he saw fit and without requisite formalities or the

involvement of the Board in matters, including full control of Cloud Daddy's finances, that were properly the subjects of Board oversight and approval.

5.      Predictably, largely as a result of Mr. Malkov's mismanagement in violation of Mr. Sidorov's contractual and other rights, Cloud Daddy now, on information and belief, teeters on the brink of bankruptcy.

6.      As detailed below, this action seeks compensatory and punitive damages and specific performance, as well as a declaration of the voiding *ab initio* of certain fraudulently induced agreements into which Mr. Sidorov entered in conjunction with his investments.

## *The Parties*

7.      Plaintiff Vasily Sidorov is an individual who resides in Moscow, Russia.

8.      Defendant Konstantin Malkov is an individual who, on information and belief, resides in Holmdel, New Jersey.

9.      Defendant Cloud Daddy, Inc. is a corporation company organized and existing under the laws of the State of New Jersey, with its principal place of business listed in its Certificate of Authority as being defendant Yuriy Kozhynov's personal residence in Freehold, New Jersey.

10.     John T. Kelly is an individual who, on information and belief, resides in Woodbridge, New Jersey.

11.     Garmal, LLC is a limited liability company organized and existing under the laws of the State of New York, with its principal place of business in Holmdel, New Jersey.

12.     Maxim Smetannikov is an individual who, on information and belief, resides in Morganville, New Jersey.

13.     MVG, LLC is a limited liability company that, on information and belief, is organized and existing under the laws of the State of New Jersey, with its principal place of business in Morganville, New Jersey.

14.     Yuriy Kozhynov is an individual who, on information and belief, resides in Freehold, New Jersey.

*Jurisdiction and Venue*

15.     Jurisdiction in this court is proper under 28 U.S.C. §1332(a) because plaintiff is a citizen of Russia and defendants are citizens of the States of New York and New Jersey, and the amount in controversy exceeds $75,000.

16.     Venue in this court is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the State of New York insofar as plaintiff was primarily induced into investing in the business at issue during meetings that took place in the State of New York. Venue is also proper in this court because the parties' Shareholders Agreement (described and defined below) provides for litigation of any disputes in this forum.

*Background*

*A. Mr. Sidorov Is Fraudulently Induced to Invest in Cloud Daddy*

17.     The course of action leading to the investment that is the subject of this case was initiated when defendant Konstantin Malkov and others solicited and, as it turned out, fraudulently induced Mr. Sidorov's investment in Cloud Daddy in a series of meetings that occurred in New York City in 2017.

18.     Messrs. Sidorov and Malkov first became acquainted with one another through mutual connections in the mid-to-late 1980s. They had lost touch until Mr. Malkov reached

out to Mr. Sidorov in 2012 on an IT-related issue, and they have consulted with each other on IT-related issues on several occasions since then.

19.     In the interim, Mr. Sidorov had become a businessman and executive in the Russian telecommunications industry, a manager of a private equity/venture capital business and a board member of several prominent entities in the Russian Federation.

20.     Mr. Malkov, in the meantime, had won a prestigious USSR Young Scientists Prize in Mathematics in 1989, had become a professor of applied mathematics and computer science at Moscow State University after receiving his doctorate from that institution and had authored dozens of scientific articles on differential equations, numerical analysis, control theory, seismological inverse problems, mathematical methods in economics and artificial intelligence.

21.     He had also played prominent and foundational IT development roles in a variety of businesses, including in the fields of cloud computing, e commerce and cybersecurity, among others.

22.     Because of his general familiarity with Mr. Malkov, including his background and credentials, Mr. Sidorov reasonably viewed Mr. Malkov as a well-credentialed and highly capable mathematical genius.

23.     On July 7, 2017, Mr. Malkov and two other individuals, one of whom was defendant Maxim Smetannikov, met with Mr. Sidorov at the Mark Hotel in New York, New York in order to solicit his investment in Mr. Malkov's startup entity, called "Cloud Daddy, Inc."

24.     Cloud Daddy was envisioned as a cloud-based secure data backup and disaster recovery technology company that would provide such services for businesses using Amazon Web Services ("AWS") hosting, which is the most widely utilized web hosting platform in the world.

25.     During the meeting, Cloud Daddy was represented by Messrs. Malkov and Smetannikov — as it turned out, falsely — to be an existing product with broad and unique functionality and a body of existing and happy customers, and Cloud Daddy was also described to Mr. Sidorov as already having a team in place ready to further develop the product, with work/development already having begun prior to that meeting.

26.     Mr. Sidorov himself had and has no background or expertise in software development and relied on Messrs. Malkov and Smetannikov and the representations made to him and information furnished to him at this and subsequent early meetings and communications for his understanding of the Cloud Daddy product and its uniqueness and significance in the market at which it was aimed.

27.     Shortly after the meeting, and confirming the impression Mr. Sidorov had been given, on July 19, 2017, Mr. Smetannikov sent Mr. Sidorov a follow-up e-mail transmitting a seven-page "white paper" conveying that description of the company's product as broadly functional, tapping into a several billion dollar market and with allegedly existing, satisfied customers, including both a top-20 crypto currency mining company armed with 10,000 machines and a Scandinavian government offering a glowing testimonial from its top IT officer in its Ministry of Telecommunications.

28.     As Mr. Sidorov much later came to learn, Mr. Smetannikov turned out to be a Cloud Daddy shareholder (through an investment entity of his called "MVG, LLC"), without, however, ever having put any money into the company, while the alleged customers either never existed at all or were, at best, mere users of a free trial-level version of Cloud Daddy's software.

29.     On September 14, 2017, Mr. Malkov sent a draft of a subscription agreement ("Subscription Agreement") and Cloud Daddy's capitalization table to Mr. Sidorov.

30.     Mr. Sidorov's understanding based on this and subsequent capitalization tables provided by Mr. Malkov was that prior to this planned round of investment, Mr. Malkov, through his entity, Garmal, LLC ("Garmal") (of which, as Mr. Sidorov discovered much later, certain other Cloud Daddy investors were also members), had put approximately $1 million in cash into Cloud Daddy. As it turned out later — when Mr. Sidorov began asking questions after other misdeeds by Mr. Malkov had come to light in 2020 — Mr. Malkov could offer no proof that such money had actually been contributed by him and/or Garmal, and in fact, this fudged number consisted in significant part of opaque "sweat equity."

31.     A subsequent meeting between Mr. Malkov and Mr. Sidorov took place on September 19, 2017 at Le Bilboquet restaurant in New York. The purpose of that meeting was to further solicit Sidorov to make an investment in Cloud Daddy, and during the meeting Mr. Malkov further touted the continued progress of the Cloud Daddy product and business.

32.     Subsequent to that second in-person meeting related to the Cloud Daddy investment, Mr. Malkov resent to Mr. Sidorov on September 20, 2017 a draft of the Subscription Agreement, with its attached capitalization table, and a non-disclosure agreement signed by defendant Yuriy Kozhynov, as Cloud Daddy's "founder and CEO."

33.     On September 28, 2017, Mr. Malkov and Mr. Sidorov had a call with a product demo to further solicit an investment into Cloud Daddy from Mr. Sidorov. Mr. Smetannikov also participated in this call. On that same day Sidorov signed a proposed non-disclosure agreement with regard to the potential investment.

34.     On October 4, 2017, Mr. Malkov sent Mr. Sidorov Cloud Daddy's Certificate of Incorporation, a draft of the A1 Round Shareholders Agreement ("Shareholders Agreement") and the Subscription Agreement for common stock of Cloud Daddy.

35.     On October 18, 2017, Mr. Sidorov confirmed his interest in investing $200,000 into Cloud Daddy, subject to documentation.

36.     Mr. Sidorov then proceeded to negotiate on the content of the draft Subscription Agreement with Mr. Malkov, with Mr. Malkov receiving substantial input from Cloud Daddy corporate counsel John T. Kelly, an attorney with the firm of Wilentz, Goldman & Spitzer, P.A., though Mr. Kelly would later repeatedly deny knowledge of and involvement in this round of investment and, apparently, was working on the documents without a retainer agreement as yet in place.

37.     In response to certain proposed changes suggested by Mr. Sidorov, Mr. Malkov wrote in an e-mail of October 31, 2017 that "cutting some corners" was necessary to avoid overspending on legal fees, as this was a "friends and family" round of investment, and Mr. Kelly echoed the substance of those comments in an e-mail sent on the same day.

38.     A further draft of the Subscription Agreement discussed in November 2017 attached a capitalization table representing that the total investment into the company in this first round of investment would be $907,500.

39.     Undisclosed to Mr. Sidorov at the time — and as he learned only later, in 2020 — was the material fact, well known to Mr. Malkov, that other investors listed in the capitalization table pertaining to that same round of investment had either contributed no cash but only "sweat equity," for which they were awarded numbers of shares calculated in a fashion that remains opaque. Of the $907,500 represented as being invested in Round 1, only $375,000, including Mr. Sidorov's own $200,000, reflected an actual cash investment into the company.

40.     Moreover, even of the $375,000 actually invested into the company at this time, another material fact known to Mr. Malkov but not revealed to Mr. Sidorov at the time Mr. Sidorov made his investment was that investors would be paying/had paid different prices (some

higher and some lower) than the price Mr. Sidorov paid for their shares: while Mr. Sidorov's per-share price was $1,111.11, for example, another investor, Yuri Brazhnikov (through his entity YB Investments, LLC), had paid only $666.70 per share.

41.     These facts, had they been known to Mr. Sidorov, would clearly have materially impacted his assessment of the company and the investment he had been induced to make.

42.     In further e-mails of November 18, 2017, Mr. Malkov stated that Cloud Daddy would have a five-person Board of Directors, to include, in addition to Mr. Sidorov himself, Yuriy Kozhynov, Joe Merces, Maxim Smetannikov and Andrey Korepanov or Pavel Koptev and that an operating budget would require a board vote, while CEO appointment, re-capitalization and mergers and acquisitions would require a unanimous board vote.

43.     Both Messrs. Malkov and Kelly also stated in e-mails that developers would sign over their intellectual property to Cloud Daddy. As Mr. Sidorov later discovered, that did not, in fact, happen until April-May 2019.

44.     On December 6, 2017, Mr. Malkov informed Mr. Sidorov that Joseph Merces, an individual with a substantial background in product development and management, would be resigning as Chief Information Officer of the New York City Law Department and joining Cloud Daddy as its CEO.

45.     On the same day, Mr. Sidorov executed the Subscription Agreement and forwarded it to Mr. Malkov. The Subscription Agreement was later modified to correct a detail not material to this case, and that final version of the Subscription Agreement was executed by Mr. Sidorov on December 15, 2020. The agreement was countersigned by Yuriy Kozhynov on behalf of Cloud Daddy on December 16, 2017.

46.     Pursuant to the Subscription Agreement, expressly governed by New York law, Mr. Sidorov agreed to purchase 180 shares of common stock of Cloud Daddy (out of 1,500 shares authorized), representing 12% of the company's issued share capital, at an aggregate price of $200,000.

47.     As agreed, Mr. Sidorov paid over his $200,000 investment to the company shortly thereafter. Later, on January 2, 2018, Mr. Sidorov would receive a scan of a Cloud Daddy share certificate confirming his ownership of 180 shares (out of 1500 authorized), representing 12% of the issued share capital of the company.

48.     On December 19, 2017, Mr. Sidorov proceeded to execute the Shareholders Agreement, which was countersigned by Mr. Kozhynov the next day.

49.     Notably, however, despite the fact that the Shareholders Agreement was stated in its opening paragraph to be "entered into by and among (i) CloudDaddy, Inc. ... (ii) Vasily Sidorov, and (iii) the Persons whose names and addresses appear from time to time on Schedule I hereto (the 'Other Investors')," on information and belief, as discussed further below, none of the seven individuals (except for Mr. Kozhynov, who signed on behalf of Cloud Daddy) and entities appearing on the attached Schedule I ever signed the agreement, were ever *asked* to sign the agreement or were ever, including in the opinion of corporate counsel John Kelly, even *intended to be asked* to sign the agreement.

50.     The Shareholders Agreement, attached as Exhibit A hereto, contains several noteworthy provisions:

   a.   A provision at ¶1(b), obligating Cloud Daddy, within certain specified time frames, to provide Mr. Sidorov with certain categories of financial reports (quarterly unaudited U.S. GAAP financial statements, unaudited and audited annual financial

statements, quarterly management reporting packages, annual budgets and operating plans, independent audit reports);

b.  A provision at ¶1(c), obligating Cloud Daddy to permit Mr. Sidorov and his agents to inspect and receive copies of company books and records, as well as to discuss the company's affairs with Cloud Daddy's officers, directors, key employees and independent public accountants;

c.  A provision at ¶2(a), setting an initial Board of Directors, to consist of Mr. Sidorov, Yuriy Kozhynov, Andrew (a/k/a "Andrey") Korepanov, Maxim Smetannikov and Joe Merces.

d.  A list of items set forth at ¶2(b) requiring unanimous Board approval for:

> Re-capitalization, M&A, Founder Stock Sale, CEO appointment, assumption of any bank or third-party debt, shareholder loans, guaranteed and other contingent liabilities in favor of third parties, shareholders and/or their affiliates, any interested-party transactions, changes to company's bylaws, contracts in excess of $100,000, appointment of auditors, annual budgets.

e.  Paragraph 3(e), granting Mr. Sidorov a right of first refusal with respect to any other Cloud Daddy investor's intended transfer of shares, such that the shares would first have to be offered for sale to Mr. Sidorov.

f.  A "Subscription Right" at ¶3(f), per which any further sale issuance of stock, options or other rights or debt convertible into equity securities was subject to "written notice [to Mr. Sidorov] setting forth in reasonable detail" all the material terms thereof and "offer[ing] to issue to Vasily Sidorov a portion of the Proposed Securities equal to a percentage determined by dividing (x) the number of shares of Common Stock and Share Equivalents Owned by Vasily Sidorov, by (y) the total number of shares of Common Stock and Share Equivalents then Owned by all

Investors," with Mr. Sidorov then having 10 days after receipt of such notice to choose to exercise such purchase rights.

g.  A "Put Right" in ¶3(g), which required Cloud Daddy and its current investors, jointly and severally, "to purchase all of the Shares then held by Vasily Sidorov … for a purchase price payable in cash in an amount equal to the Vasily Sidorov Purchase Price Per Share" if it committed a material breach of the agreement and did not remedy such breach (for any breaches that could be remedied) within "30 days after written notice thereof from Vasily Sidorov."

h.  A "Dilution Provision" at ¶3(h), requiring Cloud Daddy, in the event of any planned further subscription round in the future, to secure unanimous Board approval and "consent of all A1 round participants including Vasily Sidorov."

i.  A further "Antidilution Adjustments" provision at ¶5(a) that provided that if Cloud Daddy issues or sells shares at a price lower than Mr. Sidorov's pre-issuance price per share, "then simultaneously with such issue or sale …, the Vasily Sidorov Purchase Price Per Share shall … be reduced to the consideration per share in such Triggering Transaction," with the effect that Mr. Sidorov's number of shares would be increased to prevent dilution.

j.  A similar protection at ¶5(a)(i) for any options issued by the company, such that if the total consideration received by Cloud Daddy in the granting and exercise of such options would result in a per-share price that is less than Mr. Sidorov's price per share, then the amount of common stock issued as a result of any such conversion of options into common stock will be decreased to equal Mr. Sidorov's price per share.

k.  A choice of law and forum-selection clause at ¶7(d), applying Delaware law to the
agreement "in terms of formation and statutory matters" and New York law "for the
matters of operation" and requiring "a[]ll judicial actions brought against the parties
arising out of or relating to this Agreement, or any obligations hereunder [to] be
brought in any state or federal court of competent jurisdiction in the State of New
York, New York City."

l.  A provision at ¶8(h), per which any breach of the Shareholders Agreement would
automatically be deemed irreparable harm that cannot be compensated with
monetary damages and that would entitle the aggrieved party to injunctive relief,
including specific performance.

51.  Notably, because Mr. Brazhnikov/YB Investments, LLC made their Round 1
investment into the company in January 2018, *i.e.*, after Mr. Sidorov's investment in December and,
as described above, at a substantially lower per-share purchase price (a fact that, as described above,
was not disclosed to Mr. Sidorov at the time and that was only discovered by him in the fall of 2020,
after other misdeeds had come to light), that transaction should have triggered Mr. Sidorov's
antidilution protection contained in Shareholders Agreement ¶5(a).

52.  Mr. Sidorov, however, has not been made whole in conjunction with this
transaction.

B.  *Cloud Daddy's Operations Between Mr. Sidorov's First and Second Investment*

53.  Soon after Mr. Sidorov's investment had been made, a series of events
occurred that began to suggest to Mr. Sidorov that Cloud Daddy was not as far along in its product
development or business operations as he had been led to believe based on the materials presented
to him at the time of his initial investment and that also led him to question the informality of its

operations that were inconsistent with the Shareholders Agreement and its descriptions of the
Board's required role in various corporate actions.

54.     On December 27, 2017, Mr. Sidorov advised Messrs. Malkov and Kozhynov
that Cloud Daddy was in breach of the time limits set in ¶1 of the Shareholders Agreement and
asked when Cloud Daddy's operating plan and budget were going to be submitted to the
shareholders/Board for approval.

55.     In response, on December 31, 2017, Mr. Malkov sent to Mr. Sidorov a
version of Cloud Daddy's operating plan for 2018, which projected annual revenues at $131,750 and
expenses (mostly related to product development) at $815,000.

56.     An initial Board meeting was held on January 10, 2018, with the participants
being Messrs. Sidorov, Malkov, Merces, Kozhynov, Smetannikov, Andrey Korepanov and Pavel
Koptev. Unbeknownst to Mr. Sidorov at the time, these last two individuals had worked and/or
were working as Cloud Daddy developers, were investors in Cloud Daddy through their respective
entities, AKRP, LLC and PKP, LLC, and were also members of Mr. Malkov's entity, Garmal.
Moreover, it is unclear how Mr. Koptev was elected or otherwise placed on the Board *at all*, as he
was not a member of the initial Board set in Shareholders Agreement ¶2(a), nor is Mr. Sidorov aware
of any valid election or other mechanism through which he might have become a Board member.

57.     At the Board meeting, it was resolved that Cloud Daddy would develop its
initial marketing plan and suggested marketing budget within 10 business days, with a detailed
marketing plan and an operating plan (to include two-year revenue projections and P&L) within 45-
60 days and submitted for Board approval.

58.     Shortly after the Board meeting, Mr. Sidorov suggested to Mr. Malkov that
for the sake of proper corporate governance, it would be best to split up the functions of Chairman
of the Board and CEO — currently both apparently held by Mr. Merces — and also questioned

how Mr. Merces had been made Chairman, as that function required election by the Board, which had not happened; Mr. Sidorov suggested that Mr. Malkov himself might be a better choice for the Chairman role.

59.    Mr. Malkov responded that Mr. Merces' role as Chairman should be formalized in a Board meeting but did not respond in any detail to the rest of Mr. Sidorov's comments. Mr. Merces' role as Chairman was, in fact, never formalized thereafter.

60.    On February 15, 2018, Mr. Merces sent out a Cloud Daddy "Business Model-Plan." The plan contained the following significant elements:

- It described a "conservative" scenario projecting 2018 revenues at $469,802.

- The P&L forecasted total revenues at $1,212,683 and net operating income of $594,531.

- The plan mentioned Mr. Kelly as the Cloud Daddy's attorney and Peter Greco of CSI Group as the company's accountant. The Org Chart indicated that Maxim Smetannikov is the company's marketing VP, Yuriy Kozhynov is COO, Yuriy Vikhanov is Development VP and that there was a total of nine+ employees/managers at the company.

- Startup Expenses up to launch on April 4, 2018 were estimated at $932,500. Development expenses were stated as being $352,570.

- The company's balance sheet had zero/nothing for patents and trademarks. The only company asset was cash at the bank. No patents or trademarks were projected to appear on the company's books at the end of 2018.

61.    On information and belief, the company never had anything like the "nine+ employees/managers" described in the business plan.

62.   On June 26, 2018, Mr. Merces wrote to Mr. Sidorov to advise that (after an unexpected delay caused by a wait on the Amazon Marketplace team to give necessary approvals), the Cloud Daddy software was now generally available:

> I'm happy to report that Cloud Daddy is Generally Available today! Our website was made public over the weekend and our products were made public on the AWS Marketplace today. You can visit our website at https://www.clouddaddy.com You can see our products on the AWS Marketplace by either following the below link or visiting the AWS Marketplace and doing a search for Cloud Daddy. https://aws.amazon.com/marketplace https://aws.amazon.com/marketplace/search/results?x=0&y=0&searchTerms=cloud+dad dy&page=1&ref_=nav_search_box I've had many interviews with industry analysts as well as editors and they're all very receptive and supportive of our solution for AWS and will release briefings on or after this Thursday the 28th. Our Marketing and PR will commence this Thursday the 28th.

63.   Mr. Malkov reported to Mr. Sidorov on July 14, 2018 that the first sales had started to come in and highlighted positive press coverage of Cloud Daddy on CRN:

https://www.crn.com/slide-shows/data-center/300106231/the-10-hottest-data-storage-startups-of-2018-so-far.htm/pgno/0/3.

64.   A week later, Mr. Merces passed along more positive press coverage and reported to Mr. Sidorov that Cloud Daddy had "received 128 quality leads."

65.   Despite the seemingly positive news, on August 3, 2018, Mr. Merces sent same-day Board meeting materials to Mr. Sidorov, which included a revised sales forecast for 2018 with sales projected at $53,000, i.e., less than 5% of the February projections. The projections also included a 12-month sales forecast for 2019 at approximately $1 million and for 2020 at $4 million.

### C.   Mr. Sidorov Is Fraudulently Induced to Contribute $252,000 to the Round 2 Financing to Avoid Dilution

66.   On August 28, 2018, Mr. Malkov forwarded to Mr. Sidorov documents (including a confirmation of a trademark filing and an acknowledgment of receipt for Cloud Daddy's patent filing) compiled by Mr. Merces — the same documents were later sent by Mr. Merces as well

— that presented what was packaged as a "Round 2 financing" but that, in reality, was little more than a ruse to extract another substantial contribution to Cloud Daddy from Mr. Sidorov.

67.    In October 2018, within the framework of further "Round 2 financing" discussions, Mr. Sidorov asked for clarification about how much was being raised and whether he was expected to put money into the round, to which Mr. Malkov responded by forwarding to Mr. Sidorov an October 23, 2018 response from Mr. Kelly in which Mr. Kelly stated that on the current assumption that "$2.1 million will be raised in this round of financing and shares will be sold at a price of $50 per share in this round,"

> [a]s shown in my cap table, on a fully-diluted basis, Vassily [sic] currently owns 11.651% of the 100,000 outstanding shares of the company, with each share having a value of $50. If $2.1 million is being raised in this round at a price of $50 per share, that means 42,000 new shares will be issued in this round (2,100,000/50 = 42,000). Therefore, to not suffer any dilution from his current ownership position, Vassily [sic] would have to purchase 11.651% of the new 42,000 shares, or approximately 4,893 shares. At $50 per share, those 4,893 shares would cost him $244,650.

68.    Although Mr. Sidorov was relying on Mr. Kelly's advice as an attorney interpreting the provisions of the Shareholders Agreement and did not realize it at the time, this was a misstatement of what Mr. Sidorov's antidilution protection in the Shareholders Agreement entailed. Specifically, as described above, that protection, set forth in ¶5 of that agreement, required the company to decrease Mr. Sidorov's price per share where, as here, a subsequent share issuance would be for less than his price per share — thereby simply awarding him more shares rather than requiring him to contribute more money to keep his stake in the company.

69.    Having noted the "11.651%" number specified by Mr. Kelly as reflecting Mr. Sidorov's stake in Cloud Daddy and the discrepancy between that and the 12% reflected in the share certificate he had received on January 2, 2018, Mr. Sidorov asked for an explanation and a capitalization table that would show how much was to be committed by whom in Round 2.

70.     Specifically, in an October 30, 2018 e-mail to Mr. Malkov, Mr. Sidorov asked whether there had been dilution since the date of his share certificate and, if so, why he had not been informed and/or asked to vote on whatever corporate action had led to any such dilution and why a new share certificate had not been issued. Mr. Malkov responded to say he would inquire of Messrs. Merces and Kelly but stated that there had been no dilution of shareholders thus far.

71.     Mr. Malkov responded further on October 31, 2018, attaching an e-mail from Mr. Kelly, which taken together, stated that as of the present time, there had not yet been any dilution nor official action taken by Cloud Daddy or its Board, but that the confusion was due to the fact that defendant Garmal (as above, Mr. Malkov's LLC, in which other Cloud Daddy investors were, unbeknownst to Mr. Sidorov at the time, also members) had allegedly put $50,000 into Cloud Daddy for "additional [a]rtificial intelligence detection module and related patent filing," with Mr. Merces putting in $25,000 and Yuri Brazhnikov putting in $17,000 "to cover ongoing expenses until A2 [financing round] is closed in November," and while Mr. Kelly had initially thought to ascribe those investments to the Round 1 financing in informing Mr. Sidorov of how much he would be diluted in Round 2, they would now be ascribed to the Round 2 financing, such that "all of the necessary transactions will be approved by the appropriate corporate Board action of Cloud Daddy, Inc. and will become effective simultaneously with the closing of the second round of financing."

72.     The next day Mr. Kelly proceeded to send Mr. Sidorov a revised capitalization table, with the return of the $50,000 to Garmal now to be convertible into shares of common stock at $50 per share as part of the closing of the Round 2 financing. The amount to be raised in the Round 2 financing, according to Mr. Kelly, continued to be $2.1 million, yielding "a total valuation of $7,100,000 (142,000 [shares] multiplied by $50)."

73.     In a series of follow-up emails on November 8-10, 2018, Messrs. Malkov and Kelly continued to solicit an additional investment from Mr. Sidorov of what was now calculated as

$252,000 to avoid dilution, in conjunction with which they wished Mr. Sidorov to sign another version of a shareholders agreement. Mr. Sidorov was told by Mr. Kelly that the valuation for the total of his $452,000 investment in the company would thereupon be $600,000, based on a $5 million pre-money valuation for the company as a whole.

74.     Mr. Sidorov, meanwhile, continued to ask questions about the mechanics of the proposed transaction and how they had been decided.

75.     Shortly thereafter, Mr. Sidorov was asked by Mr. Kelly to execute and did execute his consent as a member of the Board to the stock split and increase in authorized shares that would be needed in conjunction with the proposed transaction.

76.     When he was sent a Round 2 subscription agreement ("Round 2 Subscription Agreement") by Mr. Merces on November 21, 2018, attaching a capitalization table, he responded that the attached table was confusing and asked Mr. Malkov to "include who is putting money into the round and what the post-money shareholder composition will be."

77.     Mr. Malkov did not provide a direct answer to this question and stated that while he could not yet provide a post-money capitalization table due to the fact that "we are still deciding if we will take money from 2 other investors," the "[t]otal raise amount [of $2.1 million] is not changing."

78.     Mr. Malkov knew full well, at the time he was characterizing the "[t]otal raise amount" as $2.1 million that this statement was false and that nothing even approaching this number was, in fact, being raised as part of the fraudulent Round 2 financing.

79.     Mr. Kelly then proceeded, on November 22, 2018, to send Mr. Sidorov a version of the Round 2 Subscription Agreement that was already executed by the company, but Mr. Sidorov, before agreeing to anything, continued to insist on seeing a post-money capitalization table

in order to know who was investing what in the company in conjunction with the second investment round.

      80.    Mr. Malkov sent the following response on November 23, 2018:

> John is off today (and possibly tomorrow), but we asked him to compile tentative 'post money' CAP table (after 2.1 mln round) last night after your e-mail below. As we discussed – there are 2 investors in question – Ron and Spencer Kupfermans; after speaking with you, and some thinking – I believe we should go ahead with accepting them as part of round A2. They should bring savvy business dev experience in the software field, as well as good connections in Channel Partners network. So unless there will be objections [f]rom you (I already spoke with co-founders and YB LLC[,] just as with you and Joe) – I believe we should go ahead with them.

> Alternatively we were considering to splitting remaining 486K between my LLC, YB LLC, AKRP/PKP LLCs a[n]d yourself (if you would like to go for it). Anyway – here is the list. Once John compiles it into post-money XLS, checks it – I will send it to you:

> YB Investments, LLC - $150,000.00
> GARMAL, LLC - $800,000.00 (of which $100,000 is already invested under debenture)
> Joe Merces - $25,000.00
> Vasily Sidorov - $252,000.00
> AKRP, LLC - $150,000.00
> PKP, LLC - $150,000.00
> VMVS, LLC. - $25,000.00
> Alex Pshezhetsky - $12,000.00
> Vadim Elkin - $50,000.00
> Ron and Spencer Kupferman - $486,000.00
> 2,100,000.00

> Some of this money was already invested under debentures as discussed, and now as we have the approval for the stock split and issuance of the shares – we will complete the rest.

> 2 new guys we got on the list bring also strategic +s in marketing and in Healthcare vertical.

> PS. Just got a text from Golbergs - they may want to put more in, so may decrease Kupferman's or my portions (or split) 100k. It does not change much though - will tell John.

      81.    Relying on the information and calculations provided, Mr. Sidorov confirmed on November 26, 2018 that he would be investing the $252,000 he was falsely told was necessary to maintain his 12% stake in the company.

      82.    In a further e-mail of November 27, 2018, Mr. Malkov sent Mr. Sidorov a "Subscription Package" that made clear that the following investors would be participating in the

Round 2 financing, all at the price of $50 per share, with the listed percentages reflecting these investors' post-Round 2 ownership of the company:

Ron Kupferman: 4,860 / $243,000 / 3,423%
Spencer Kupferman: 4,860 / $243,000 / 3,423%
Vadim Elkin: 1,500 / $75,000 / 1,056%
Alex Pshezhetsky: 240 / $12,000 / 0,169%
Joe Merces: 500 / $25,000 / 0,352%
GARMAL: 13,500 / $675,000 / decreasing from 51% to 45,423%....
Sidorov: 5,040 / $2[5]2,000 / 12%
AKRP: 3,000 / $150,000 / 7,394%
PKP: 3,000 / $150,000 / 7,394%
YB Investments: 3,000 / $150,000 / 5,634
Total financing round size – $2,100,000

83.     Based on this final information, which was false and known by Mr. Malkov to be false, Mr. Sidorov executed the Round 2 Subscription Agreement on November 27, 2018 and sent it to Messrs. Malkov and Merces, in conjunction with which, before the end of 2018, he transferred the full $252,000 at issue to the company.

84.     Notably, however, as discussed further below, as Mr. Sidorov discovered significantly later and well after making his $252,000 investment in Round 2, nothing approaching the $2.1 million total unequivocally stated by Messrs. Malkov and Kelly as coming in Round 2 was ever contributed or intended to be contributed: among other things, the Kupfermans did not contribute anything at all until coming in through a separate transaction at a substantially lower per-share price that occurred many months later, and the terms of which were deliberately concealed from Mr. Sidorov and approved without his knowledge and consent, while others deceptively listed by Messrs. Malkov and Kelly as contributors to Round 2 — most notably Garmal, AKRP, LLC and PKP, LLC — were, in reality, simply awarded shares in an opaque fashion in exchange for "sweat equity." In total, other than Mr. Sidorov's contribution of $252,000, prior to the Kupfermans' later investment at a lower price, only another $172,000 of the purported $2.1 million was, in fact, invested.

D. *Cloud Daddy's Operations Between Mr. Sidorov's Second Investment and the Kupfermans Transaction*

85.    As of January 11, 2019, Mr. Malkov continued painting a picture of a rosy future and high valuation for Cloud Daddy, sending Mr. Sidorov news of the acquisition of a competitor by Amazon for between $200 and $250 million and stating that Cloud Daddy was a better product.

86.    On January 14, 2019, he further stated that Cloud Daddy "is doing quite well so far" and, tracking its "quick[ly]" "growing" "footprint," represented that Cloud Daddy had two new significant customers, that 28 customers were using the trial version, with a significant percentage of those expected to transition to the paid version, that two new full-time sales executives had been hired and that a version 2.0 with significant improvements to the Cloud Daddy product would soon be concluded.

87.    Mr. Malkov sent along yet more good news about new customers and positive press coverage ("Cloud Daddy has won the 2018 Backup & Disaster Recovery Award, presented by Cloud Computing Magazine!") in February.

88.    In March, Mr. Malkov sent an investor update from Mr. Merces touting yet more positive press coverage, noting overwhelmingly positive customer reviews, the release of a new update to the product, a new partnership to add secure messaging to the product's functionality and support for the product in more geographic regions.

89.    In response, in an e-mail of March 18, 2019, Mr. Sidorov, while acknowledging the positive news, asked Messrs. Merces and Malkov to see actual hard data concerning the company's fortunes and finances. In addition, addressing Mr. Malkov in particular, he wrote:

> Konstantin, I am a little puzzled by why our "board" does not really operate. Is there nothing for us to discuss? 2018 has passed, we are already in the 3rd month of 2019… To me this is a sign of either everything going GREAT, or of things going PRETTY BAD.

Either way it would be useful to have some level of regular discussion going. I can tell you that this case is very unusual for my portfolio: regardless of the project/business development stage, there is some level of communication with the investors on a weekly/monthly/quarterly basis. This is making me a little nervous, to be honest.

90.    Mr. Merces responded with, among other things, a P&L for 2018 showing total sales of only $14,074.55 and a net loss of $704.400.

E.  *The Undisclosed Kupfermans Transaction*

91.    In mid-April 2019, Mr. Merces sent Mr. Sidorov a further e-mail stating that a Board meeting would be scheduled in a few weeks, with an agenda to be sent a few days prior. No such agenda or other notification of a Board meeting was ever sent to Mr. Sidorov, however.

92.    Ten days later, on April 26, 2019, a meeting of the Cloud Daddy's shareholders was apparently held, and a few days later, on April 29, 2019, a Board meeting was apparently held.

93.    Mr. Sidorov did not receive notice of and was never invited to either meeting and never received any documents pertaining to those meetings.

94.    On information and belief, the exclusion of Mr. Sidorov from those meetings was deliberate.

95.    The meetings were apparently led by Messrs. Kelly and Malkov, despite the fact that Mr. Merces, who was present, was ostensibly Chairman of the Board.

96.    During these meetings, a transaction involving the Kupfermans (a father (Ron) and son (Spencer)) was allegedly approved, in which the Kupfermans were permitted to acquire an over 14.5% stake in Cloud Daddy at a significantly discounted price of $18.95 per share (hereinafter the "Kupfermans Transaction").

97.    During these same meetings, Spencer Kupferman was named Cloud Daddy's CEO, another fact not known to Mr. Sidorov at the time.

98.     Despite, as described above, both having clearly represented to Mr. Sidorov that all shareholders, including the Kupfermans would be buying shares at $50 per share as part of the Round 2 financing that had occurred in November 2018, neither Mr. Malkov nor Mr. Kelly disclosed the actual terms of the Kupfermans Transaction to Mr. Sidorov. In fact, as described further below, Mr. Sidorov was not told and did not discover the price at which the Kupfermans had been allowed to buy in until a year-and-a-half later, in October 2020.

99.     On information and belief, the non-disclosure of this key information and the failure to get his consent and approval for the Kupfermans Transaction and Spencer Kupferman's appointment as CEO was intentional, as Mr. Malkov and his collaborators understood that Mr. Sidorov would have been an obstacle to the terms of the Kupfermans Transaction and would have immediately realized he had been deceived in the course of the Round 2 financing.

100.     As noted, the Kupfermans Transaction was utterly inconsistent with the terms of the Round 2 investment that had been represented to Mr. Sidorov by both Messrs. Malkov and Kelly in e-mails and the post-money capitalization table for Round 2 that had induced him to make his additional $252,000 investment.

101.     The Kupfermans Transaction, made without disclosure to or the consent of Mr. Sidorov, was also undertaken in plain violation of multiple rights to disclosure, consent and dilution protection in his Shareholders Agreement, including, without limitation, ¶¶2(b), 3(f), 3(h) and 5(a) thereof.

102.     In the weeks after the meeting, as part of the Kupfermans Transaction that brought them into the company, Mr. Sidorov was asked to execute and, on May 17, 2019, *did* execute an Amended and Restated Shareholders Agreement ("Second Shareholders Agreement"), attached as Exhibit B hereto, a document he — again, operating under the deliberately induced misconception that the Kupfermans were coming in on the same terms as all other Round 2

investors and on the false representation that a total of $2.1 million was being contributed in Round 2 — was led to believe was necessary to complete the Round 2 financing and bring the Kupfermans into the fold.

103.    Among the changes in the new agreement, which purported to amend the Shareholders Agreement, was a provision (appearing at ¶1(f) thereof that stated that if Mr. Malkov was not working for Cloud Daddy on a full-time basis by January 1, 2020 "and thereafter for a period of at least six months ending on June 30, 2020," 9,079 shares of Common Stock in the company would be issued by Garmal to the Kupfermans, while Mr. Sidorov, as well as all other investors, would also receive from Garmal an amount of shares calculated by dividing 9,079 by the number of shares then outstanding.

F.   *Mr. Sidorov's Mounting Frustrations with Cloud Daddy's Operations During Spencer Kupferman's Tenure as CEO*

104.    In October 2019, following an October 17, 2019 Board meeting — the company's first since the Kupfermans Transaction — Mr. Sidorov followed up with concrete requests to Mr. Malkov to get a grip on the company's governance, budget and business strategy going forward.

105.    Mr. Malkov's response, among other things, included a monthly budget showing $24,500 in sales, as compared to a monthly burn (net of revenues) of $87,780, and a balance sheet continuing to show no IP assets and nothing other than $232,000 in cash in the bank. Shortly thereafter, he also promised to speak to Mr. Kelly and make sure proper governance would be instituted.

106.    Mr. Sidorov also voiced frustration at the manner in which the Kupfermans had been brought into the company without proper procedures and Board resolutions, as well as at the fact that he had not been immediately told that they did not actually participate in the Round 2

financing at the same time as other investors. (He was not, at this point, yet aware of the fact that they had also bought in at a much lower per-share price, as described further below.)

107.    In response, Mr. Malkov sent to Mr. Sidorov documents pertaining to the Kupfermans Transaction, including relevant Board action with regard thereto, all of which Mr. Sidorov had not previously seen and which had apparently been discussed and approved at the alleged April 26, 2019 shareholders meeting and/or April 29, 2019 Board meeting, of which, as above, Mr. Sidorov had deliberately not been notified at the time.

108.    These documents, however, did not in any way indicate to Mr. Sidorov that the Kupfermans had been permitted to buy their shares in Cloud Daddy at a significantly lower price, a fact that Mr. Malkov continued to conceal.

109.    In mid-December 2019, Mr. Malkov informed Mr. Sidorov that Mr. Malkov's employer, for which he was apparently still working as CTO, had been acquired by Acronis International GmbH ("Acronis").

110.    While, as described further below, Mr. Sidorov did not discover this until substantially later, *viz.*, August 2020, Mr. Malkov would, in fact, proceed to be employed on a *full-time* basis by Acronis and, on information and belief, continues to be employed on a full-time basis by Acronis to the present day.

111.    His full-time employment status with Acronis is a breach of ¶1(f) of the Second Shareholders Agreement (described above), which required his full-time employment with Cloud Daddy by January 1, 2020 and, moreover, was a violation of the fundamental understanding on which Mr. Sidorov — and, on information and belief, the Kupfermans as well — had invested in Cloud Daddy, *viz.*, that Mr. Malkov was its driving force and would be fully and actively involved in every aspect of its operations but particularly in the continued development of its core product.

112.     During this same time period, *viz.*, on November 30, 2019, Spencer Kupferman resigned as CEO of Cloud Daddy. The CEO role was not filled by anyone thereafter and, on information and belief, Cloud Daddy ceased to engage in any significant marketing and sales of its product.

G.  *Mr. Sidorov's Continued Frustrations with Cloud Daddy's Operations After Becoming Chairman of the Board*

113.     In mid-January 2020, in the course of responding to numerous questions and concerns Mr. Sidorov had about the company's past and continued lack of proper corporate governance, Mr. Malkov disclosed that he had loaned money to Cloud Daddy.

114.     On February 7, 2020, a Board meeting took place during which Mr. Sidorov was elected Chairman of the Board.

115.     After being elected Chairman, Mr. Sidorov continued in his longstanding effort to create more transparency and formality in Cloud Daddy's operations and to gain a better grasp of the company's financial situation and business strategy going forward.

116.     In March 2020, Mr. Sidorov pressed Mr. Malkov for formal documentation as to the alleged loan Mr. Malkov had provided to Cloud Daddy, in response to which Mr. Malkov explained that there had been no formal note but that the loan could be convertible into shares during the upcoming round of financing that had been discussed for some time.

117.     In early March, Mr. Malkov also sent out the company's financial statements, which, for 2019, stated revenue of $202,524 and a net loss of $1,208,754.

118.     In the course of back-and-forth with Spencer Kupferman and others during March 2020, Mr. Sidorov also came to learn that Cloud Daddy, as of the present time, was largely no more than a product without a real business surrounding it or a solid strategy to generate sales. Notably, Mr. Malkov himself agreed with that assessment.

119.    In early April 2020, Mr. Sidorov called for a Board meeting to be held to discuss, among other things, Cloud Daddy's funding, plans and operations for the rest of 2020.

120.    In anticipation of the Board meeting, Mr. Malkov sent an itemization of an alleged $94,310 in payments that he had personally advanced on behalf of the company, but the underlying files allegedly documenting these payments were lacking significant details, including who was making payments to whom and in consideration for what.

121.    In anticipation of the Board meeting, Mr. Malkov also circulated an e-mail drafted by Mr. Kelly and containing proposed terms for the further round of financing that had long been discussed. Those terms contemplated a pre-money company valuation of $3.2 million, such that each outstanding share of common stock had a value of $19.55.

122.    Due to the failure of Mr. Malkov to get together materials necessary for the Board meeting, however, a Board meeting was not held until June, when Mr. Malkov himself called for a meeting to be held.

123.    Such a meeting was held on June 19, 2020, and during the meeting Mr. Sidorov raised concerns about the company's lack of a sales and marketing strategy.

124.    During that meeting as well, Mr. Malkov submitted an updated table of expenses, totaling $138,089, allegedly covered by him on behalf of Cloud Daddy.

125.    During July and August 2020, Mr. Malkov, as well as Mr. Merces, reported on ongoing discussions to try to sell Cloud Daddy to Mr. Malkov's employer, Acronis. Mr. Sidorov and Spencer Kupferman both repeatedly raised concerns about the lack of transparency in the process of shopping Cloud Daddy to Acronis, a particular concern with Mr. Malkov being employed by Acronis.

126.    During the course of this process, Mr. Sidorov also discovered for the first time that Mr. Malkov was actually working for Acronis *on a full-time basis*.

127.    The mutual concerns raised by Mr. Sidorov and Mr. Kupferman led to an exchange of communications between them in which, *inter alia*, Mr. Kupferman revealed the extent to which he believed that he and his father had been misled and deceived by Mr. Malkov in the process of soliciting their investment in the company, including having been told by Mr. Malkov that their investment would be followed in short order by an additional $700,000 in further funding, similar to the manner in which Mr. Sidorov's second investment had been fraudulently induced through the knowingly false promise that it was to be part of a $2.1 million round of investment.

*H.  The Initial Disclosure to Mr. Sidorov of the True Nature of the Kupfermans Transaction*

128.    During a call between Mr. Sidorov and the Kupfermans on October 4, 2020, Mr. Sidorov discovered for the first time that the Kupfermans, in investing in Cloud Daddy in Round 2, had paid a different and much lower price than his $50 per share and that the $2.1 million represented as having been raised in Round 2 had not actually been raised.

129.    In response to discovering this information, Mr. Sidorov, on October 6, 2020, asked Mr. Malkov for full information on each round of Cloud Daddy funding, including amounts contributed by each investor. Mr. Malkov claimed he needed time to check with Mr. Kelly to gather such information.

130.    In the meantime, on October 7, 2020, Ron Kupferman forwarded to Mr. Sidorov a March 22, 2019 e-mail he had received from Mr. Malkov, which, in turn, forwarded an e-mail from Mr. Kelly, which contained, *inter alia*, the following: "Ron and Spencer are not paying $50 per share like everyone else did. Their price per share is actually about $18.95/share ($250,000 divided by 13,195)."

131.    Ron Kupferman also explained to Mr. Sidorov that he and his son had been falsely told by Mr. Malkov that Mr. Sidorov was made whole in connection with the down round of investment, *viz.*, that the dilution in Mr. Sidorov's stake in the company due to the far lower per-

share price paid by the Kupfermans was accounted for in the company's dealings with Mr. Sidorov. This, of course, had not occurred.

132.     Mr. Kupferman likewise explained that the Kupfermans had lost faith in Mr. Malkov's ability as a manager after promises of his to them that had been made at the time of their investment, including Mr. Malkov's promise that another $700,000 to $800,000 would be invested shortly after their investment, did not come to fruition, as well as due to Mr. Malkov repeatedly failing to document his alleged expenditures on Cloud Daddy's behalf.

I.   *Mr. Sidorov's Demands for Further Information and Messrs. Malkov and Kelly's Evasions*

133.     After this correspondence, Mr. Sidorov put more pointed questions to Messrs. Malkov and Kelly about the discrepancy between his $50 per-share price paid in Round 2 and the Kupfermans' $18.50 per-share price and asked them for documentation as to what each investor had paid in that round of financing.

134.     Other than stating that the lower per-share price for the Kupfermans had been offered "on perception of their significant future contribution to business development, sales and marketing," Mr. Malkov put off Mr. Sidorov's query, telling him he would need to connect with Mr. Kelly to get the information together and that he personally was "not a specialist in matters relating to shares and equity."

135.     On October 10, 2020, Mr. Malkov responded to Mr. Sidorov by forwarding an e-mail from Mr. Kelly that Mr. Kelly apparently re-sent in response to Mr. Sidorov's query after having initially sent it to Mr. Malkov a year earlier, in October 2019. The e-mail, in relevant part, stated:

> Konstantin, [a]s you requested, set forth below are the amounts invested and the price per share paid by each investor for shares of the Company's stock sold in the first two rounds of financing. Please note that our Firm was not involved in the first round of financing and, therefore, we do not have copies of the subscription agreements signed by each investor in that round. Accordingly, the amount invested and price paid by each shareholder described

below for the Round 1 financing are derived from the post-financing capitalization table for the Company that Joe Merces sent me at the start of the Round 2 financing (which is the first spreadsheet attached to this email).

**ROUND 1** As we discussed, beside Garmal, the only investors listed on the post-financing capitalization table who actually paid cash for their shares, were YB Investments, Vasily Sidorov, Lilly Golberg and VMVS Consulting. All other investor[s] paid for their shares with "sweat equity". Based upon the post-financing capitalization table, YB Investments paid $666.67 per share, Vasily Sidorov paid $1,111.11 per share, and Lilly Golberg and VMVS Consulting both paid $1,333.33 per share. As you recall, after the completion of Round 1 and in preparation of obtaining more financing in Round 2, the Company completed a forward stock split of 66.666 to 1 to achieve a $50.00 per share valuation with 100,000 shares outstanding, thereby resulting in a pre-money valuation for the Company of $5,000,000. As a result of that stock split, all of the investors in the Company at the end of Round 1 received additional shares, which is reflected on the second spreadsheet attached to this email.

**ROUND 2** All investors in Round 2, other than RJK Investments (Ron Kupferman) and Spencer Kupferman, paid $50.00 per share for their stock. RJK Investments paid $18.947 per share and Spencer Kupferman paid $18.945 per share. As a result of Ron and Spencer paying less than $50.00 per share, Vasily's anti-dilution provisions kicked in and Vasily and the other investors who put money into the round received additional shares as a result. The post-financing capitalization table for the Company after the completion of Round 2 and the application of the anti-dilution provisions is attached to this email as the third spreadsheet.

136.     Mr. Sidorov continued to press for a full capitalization table and for full information on investments in Cloud Daddy since 2017, which Mr. Malkov stalled in providing.

137.     Mr. Sidorov, in the meantime, communicated with Mr. Merces regarding the manner in which the transaction involving the Kupfermans had been approved. Mr. Merces wrote to Mr. Sidorov that "[o]n 4/29/2019 we had a board meeting that was handled directly by Konstantin and John Kelly to review and approve 9 document resolutions related to the Kupfermans." Mr. Merces forwarded a relevant e-mail thread pertaining to that meeting, which thread had not included Mr. Sidorov on any of the e-mails.

138.     During the ensuing days and weeks, Mr. Sidorov — including by invoking his formal right to receive information pursuant to the shareholder agreements he had signed — continued to press Messrs. Malkov and Kelly for responses to basic questions he had posed concerning the finances and capitalization history of the company, but Messrs. Malkov and Kelly

31

repeatedly delayed and equivocated, even while acknowledging that Mr. Sidorov had been improperly diluted.

139.    On November 9, 2020, Mr. Malkov issued a partial response to some of Mr. Sidorov's queries. Among his responses was a contention that the company did not have a functioning Board until the Kupfermans were brought into the company and that, prior to that, "[a]ll decisions were made informally and collectively prior [t]o that - Joe, myself, Max Smetannikov, Vlad (he is here in NJ responsible for the Web Site and source code repository), and Yuri[y] Kozhynov."

140.    Among Mr. Malkov's other troubling responses was a contention that some $600,000 had been paid to programmers working in Russia, with no backup offered for such alleged payments, and a revelation that the amount of capital raised in Round 2 was not, in fact, the $2.1 million that had been represented in the post-money capitalization tables sent to Mr. Sidorov (and, apparently, to the Kupfermans) by Messrs. Malkov and Kelly at the time. In fact, he revealed, only approximately $1.3 million in actual cash had been raised *in total* in Round 1 and Round 2, with approximately $600,000 being the estimated value of sweat equity on Mr. Malkov's own part.

141.    On November 20, 2020, John Kelly wrote an e-mail to Mr. Sidorov copying Mr. Malkov and purporting to explain away as an inadvertent error the deception that had occurred with regard to Mr. Sidorov having been induced to buy shares at $50 per share while the Kupfermans were bought in at $18.50 per share. In the course of the e-mail, Mr. Kelly, while admitting that Mr. Sidorov had been improperly diluted as a result of the manner in which the transaction had been handled, lied in denying his own plain involvement in Mr. Sidorov's initial investment in the company, characterized decisions as having been made by the company despite the fact that Mr. Sidorov, as a Board member, was not involved in or notified of any such decisions, mischaracterized all investors other than the Kupfermans as having paid $50 per share in Round 2

despite the fact that Garmal had received shares as "sweat equity" and had transferred shares to several other investors (as described further below), thereby effectively lowering their price, admitted that he and the company had been "well aware" of Mr. Sidorov's anti-dilution rights at the time the Kupfermans eventually invested at a per-share price of $18.50 (in what Mr. Kelly was now categorizing as a third round of investment) but falsely stated that Mr. Sidorov had been asked to sign a waiver of those anti-dilution rights. He admitted that Mr. Sidorov had, in fact, not yet been made whole for the dilution that had taken place. The e-mail also failed to address or explain why Mr. Sidorov had not been notified about the details of the Kupfermans' investment until Mr. Sidorov had inadvertently discovered those facts over a year after the transaction had taken place.

142.    Mr. Sidorov called for a Board meeting, and one took place on December 4, 2020.

143.    During that meeting, Mr. Malkov admitted, among other things, that at the time he had induced Mr. Sidorov to invest in the company in Round 1, and, in fact, at every point prior to the investment of the Kupfermans in April-May 2019, Cloud Daddy did not so much as have title to the software that was its principal product. He likewise did not have adequate documentation of money that was allegedly paid to developers but promised to produce such documentation.

144.    In response to Mr. Sidorov's pointed questions, neither Mr. Malkov nor Mr. Kelly was able to account for why Mr. Sidorov had been induced to invest another $252,000 into the company in Round 2 to avoid dilution and on the false representation of a $2.1 million round of investment and why he had not been notified that the Kupfermans had, in fact, only invested later and at a significantly lower price.

J.  *Mr. Sidorov's Further Discoveries Concerning Cloud Daddy's Software and the Company's Continued Failure to Supply Information to Which Mr. Sidorov Is Entitled*

145.    In the next several days, Mr. Sidorov reached out to the developers in Russia who had worked on the Cloud Daddy software and learned from them that they were generally of the opinion that the software was still very raw, with few or no unique features and much work still necessary to make it competitive. The product, in their view, was also not ready to deal with high data volumes, which significantly limited its customer base. Generally, in their view, the product would need another six months of work from approximately 20 developers to bring it up to the level of competitors.

146.    Mr. Sidorov also learned that it was extremely unlikely that the developers had been paid anything approaching the $1 million had allegedly spent by Mr. Malkov and Garmal on product development.

147.    Mr. Sidorov alerted the rest of the Board of his findings, and in response, Mr. Malkov denied at least some of these claims and promised that he would provide documentation as to the amount the developers had been paid for their work. No such documentation to show, in any remotely transparent fashion, the full amount allegedly paid to such developers was ever provided, however, despite Mr. Sidorov's repeated requests for such documentation.

148.    In mid-December 2020, Mr. Sidorov and the Kupfermans began to demand that Cloud Daddy and/or Mr. Malkov buy out their investments in the company and make them whole for their losses, and negotiations ensued over the next several months that were conducted, for Cloud Daddy's and Mr. Malkov's part, by Mr. Kelly, who claimed to be acting as counsel for the company but who plainly appeared to be acting in Mr. Malkov's personal interest and on his direct instructions.

149.    At the same time, Mr. Sidorov continued to press Mr. Kelly for answers to the many basic questions concerning the company, its finances and its capitalization history that he had put to Messrs. Malkov and Kelly repeatedly for months.

150.    In the back and forth between Messrs. Sidorov and Kelly in February 2021, Mr. Kelly revealed that as part of the Kupfermans Transaction, Garmal had transferred a total of 13,280 shares to other Cloud Daddy investors.

151.    The alleged reason for the transfers to some of those other existing shareholders — Lilly Golberg, VMVS Consulting and Vadim Elkin — was that they, like Mr. Sidorov, had anti-dilution protections in place, and Garmal had transferred some of its shares to them to avoid dilution as a result of the Kupfermans Transaction, while transfers by Garmal to two other existing investors later revealed to be Garmal members (Andrey Korepanov and Pavel Koptev, through their respective entities defendants AKRP, LLC and PKP, LLC) had been undertaken because these individuals allegedly worked as developers for Cloud Daddy and had received shares from Garmal as apparent compensation for their efforts — with regard to which Mr. Kelly further admitted that the actual underlying product development costs allegedly incurred by Cloud Daddy were not reflected in any legal document.

152.    Notably, any such share transfers by Garmal were in breach of Mr. Sidorov's right of first refusal set forth in ¶3(e) of the Shareholders Agreement, which prohibited any other investors, such as Garmal, from transferring their shares without first having "made the offer to sell such Shares to Vasily Sidorov."

153.    Despite their continued failure to offer proof of any alleged incurring of expenses and work on Cloud Daddy's behalf, Mr. Malkov, Garmal and those associated with them have continued to take various actions, without regard to Mr. Sidorov's antidilution protections, to

push for further awards of Cloud Daddy shares to themselves as compensation for such alleged efforts and expenses.

154.    With full information from Messrs. Malkov and Kelly clearly not forthcoming, and with Cloud Daddy, under their stewardship, unable or unwilling to make a fair and adequate offer of compensation to Mr. Sidorov for the numerous breaches and other wrongs committed against him, this action follows.

FIRST CAUSE OF ACTION
AGAINST DEFENDANTS CLOUD DADDY,
KONSTANTIN MALKOV AND MAXIM SMETANNIKOV
(Fraudulent Inducement and/or Fraudulent Omission)

155.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

156.    Defendant Cloud Daddy, acting through defendants Konstantin Malkov and Maxim Smetannikov, fraudulently induced Mr. Sidorov to invest $200,000 in Cloud Daddy in December 2017 by making specific material misrepresentations of existing facts and/or specific omissions of material facts of which defendants had special knowledge, including, *inter alia*, making specific false representations during their conversations of July 7, 2017, September 19, 2017 and September 28, 2017 and in writing in the "white paper" defendants transmitted to Mr. Sidorov on July 19, 2017, that portrayed Cloud Daddy as an existing business with a market-ready product and significant customers (such as a Scandinavian nation and a prominent crypto currency mining company).

157.    Defendants, in those conversations, also communicated the specific impression that Cloud Daddy was Mr. Malkov's project and business and that he would be actively and fully involved in its operations, with his technical expertise being necessary to the project's success.

158.    As Mr. Sidorov later learned, Cloud Daddy was nothing but an early-stage product (to which the company, at the time, did not so much as hold relevant intellectual property rights), surrounding which there was no existing business, much less the kind of prominent customer base that had been conveyed by the "white paper" (Mr. Sidorov later discovered that the customers, if they existed at all, were, at best, users of a free "trial version" of the software), and to which Mr. Malkov himself was so insufficiently committed that he, unbeknownst to Mr. Sidorov, was continuing to hold down a full-time job instead of working full-time to develop Cloud Daddy's product and business.

159.    Defendant Cloud Daddy, acting through Konstantin Malkov and Maxim Smetannikov, further fraudulently induced Mr. Sidorov to invest $200,000 in Cloud Daddy in December 2017 by making specific material misrepresentations of existing fact and/or specific omissions of material facts of which defendants had special knowledge concerning both the amount of pre-Round 1 capital invested into Cloud Daddy and the amount that would be invested alongside Mr. Sidorov's $200,000 in Round 1, including, *inter alia*, by misrepresenting, in the capitalization tables transmitted to Mr. Sidorov by Mr. Malkov in September and November 2017 to induce his investment, "sweat equity" as invested capital and by concealing from Mr. Sidorov material information concerning the substantially lower prices at which other investors were permitted to buy shares.

160.    Defendant Cloud Daddy, acting through Konstantin Malkov, further fraudulently induced Mr. Sidorov to invest $200,000 in Cloud Daddy in December 2017 by making specific material misrepresentations of existing fact in portraying the Shareholders Agreement that Mr. Sidorov would be executing as part of that transaction as, on its face, an agreement between Mr. Sidorov, Cloud Daddy *and Other Investors* (*i.e.*, those listed in Schedule I to this agreement), who were going to be made subject to material obligations to Mr. Sidorov, including the significant "Put

Right," in ¶3(g) thereof), whereas Mr. Malkov, on information and belief, never had any intention to and did not, in fact, ever present that agreement to any such "Other Investors" for signature because he understood that the terms thereof would not be acceptable to such "Other Investors."

161.    As corporate counsel John Kelly — who had had input into the content of the Shareholders Agreement and/or offered advice with respect thereto, as reflected in his e-mails from October-November 2017 — opined in a May 24, 2021 e-mail when confronted by Mr. Sidorov with the lack of signatures by such "Other Investors," "It looks to me like whoever drafted the document *specifically* didn't provide for signature pages for all of the other investors." (Emphasis added.)

162.    Defendants knew the representations at issue were false and that the omissions at issue were material and would be relied upon by Mr. Sidorov.

163.    Mr. Sidorov had no reason to know these representations were false and justifiably relied on these material misrepresentations and/or omissions in investing $200,000 in Cloud Daddy and entering into the Subscription Agreement and Shareholders Agreement.

164.    Mr. Sidorov was damaged as a result of his reliance on the fraudulent misrepresentations and/or omissions at issue, including by entering into the $200,000 investment at issue and through the further investment of substantial time, money and effort in the Cloud Daddy venture thereafter.

165.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in the minimum amount of $200,000 and a further amount to be proven at trial, plus associated interest.

166.    Cloud Daddy, Mr. Malkov's and Mr. Smetannikov's conduct was gross, wanton and willful and exhibited a high degree of moral culpability which manifested a conscious disregard of the rights of others or was so reckless as to amount to such disregard.

167.     By reason of the foregoing, Mr. Sidorov is entitled to punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS CLOUD DADDY,
### KONSTANTIN MALKOV AND MAXIM SMETANNIKOV
(Negligent Misrepresentation and/or Negligent Omission)

168.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

169.     In inducing Mr. Sidorov's investment in Cloud Daddy as described herein and in the foregoing cause of action, these defendants acted with carelessness in imparting words and facts upon which Mr. Sidorov was expected to rely and as a result of which Mr. Sidorov was damaged.

170.     These defendants had a duty to impart correct information, as they knew that such information was desired for a serious purpose, would be relied upon by Mr. Sidorov and would result in damage to him, if such information proved to be erroneous.

171.     Due to soliciting Mr. Sidorov's investment in Cloud Daddy and possessing unique and specialized expertise, knowledge and information upon that subject, defendants were in a relationship of trust and confidence with Mr. Sidorov and had a duty to use care in imparting accurate information.

172.     Due to imparting information to Mr. Sidorov of which they had special knowledge for purposes of soliciting his investment in Cloud Daddy, defendants also had a duty to disclose all material information pertaining to that subject matter.

173.     They failed to discharge that duty and imparted false information and/or failed to impart full and accurate information to Mr. Sidorov.

174.     Mr. Sidorov was damaged as a result of his reliance on the misrepresentations and/or omissions at issue, including by entering into the $200,000 investment at issue and through the further investment of substantial time, money and effort in the Cloud Daddy venture thereafter.

175.     By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in the minimum amount of $200,000 and a further amount to be proven at trial, plus associated interest.

176.     These defendants' conduct was gross, wanton and willful and exhibited a high degree of moral culpability which manifested a conscious disregard of the rights of others or was so reckless as to amount to such disregard.

177.     By reason of the foregoing, Mr. Sidorov is entitled to punitive damages in an amount to be determined at trial.

THIRD CAUSE OF ACTION
AGAINST DEFENDANTS CLOUD DADDY,
KONSTANTIN MALKOV AND JOHN KELLY
(Fraudulent Inducement and/or Fraudulent Omission)

178.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

179.     Defendant Cloud Daddy, acting through defendants Konstantin Malkov and John Kelly, fraudulently induced Mr. Sidorov to invest a further $252,000 in Cloud Daddy in November-December 2018 and to execute the Round 2 Subscription Agreement and Second Shareholders Agreement in conjunction therewith by making specific material misrepresentations of existing facts and/or specific omissions of material facts of which defendants had special knowledge.

180.    In particular, such misrepresentations of material facts included (i) statements to Mr. Sidorov by Messrs. Malkov and Kelly in e-mails of October 23, 2018 and November 8th through 10, 2018 that Mr. Sidorov would need to invest $252,000 to avoid dilution of his investment in Cloud Daddy; (ii) a specific statement in an e-mail from Mr. Malkov to Mr. Sidorov on November 21, 2018 that the amount raised in Round 2 would be $2.1 million and that this "[t]otal amount is not changing," and (iii) specific lists sent to Mr. Sidorov by Mr. Malkov in e-mails of November 23, 2018 and November 27, 2018 of who would be investing the $2.1 million amount in Cloud Daddy in Round 2 and that all would be investing at the price of $50 per share.

181.    In fact, as Messrs. Malkov and Kelly knew at the time these misrepresentations were made to Mr. Sidorov, the vast majority of that purported $2.1 million did not represent any actual cash that would be contributed to Cloud Daddy, and at the time Mr. Sidorov was induced to make his $252,000 contribution, only another $172,000 in cash was being contributed.

182.    Defendant Cloud Daddy, acting through defendants Konstantin Malkov and John Kelly, further induced Mr. Malkov to enter into the Second Shareholders Agreement as part of the Kupfermans Transaction by making, as specified above, material misrepresentations of existing facts and/or specific omissions of material facts of which defendants had special knowledge, including, *inter alia*, the fact that the Kupfermans had been permitted to buy shares that were purportedly in the same round of investment as Mr. Sidorov's $252,000 investment but at a heavily discounted price of $18.95 per share, facts that these defendants took special pains to conceal from Mr. Sidorov until he discovered them long after the Kupfermans Transaction had been secretly approved without his involvement.

183.    Defendants knew the representations at issue were false and knew the omissions at issue were material.

184.    Mr. Sidorov had no reason to know these representations were false and justifiably relied on these material misrepresentations and/or omissions in investing $252,000 in Cloud Daddy and entering into the Round 2 Subscription Agreement and Second Shareholders Agreement.

185.    Mr. Sidorov was damaged as a result of his reliance on the fraudulent misrepresentations and/or omissions at issue, including by entering into the $252,000 investment at issue and through the further investment of substantial time, money and effort in the Cloud Daddy venture thereafter.

186.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in the minimum amount of $252,000 and a further amount to be proven at trial, plus associated interest.

187.    Cloud Daddy's, Mr. Malkov's and Mr. Kelly's conduct was gross, wanton and willful and exhibited a high degree of moral culpability which manifested a conscious disregard of the rights of others or was so reckless as to amount to such disregard.

188.    By reason of the foregoing, Mr. Sidorov is entitled to punitive damages in an amount to be determined at trial.

FOURTH CAUSE OF ACTION
AGAINST DEFENDANTS CLOUD DADDY,
KONSTANTIN MALKOV AND JOHN KELLY
(Negligent Misrepresentation and/or Negligent Omission)

189.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

190.    In inducing Mr. Sidorov's investment in Cloud Daddy as described herein and in the foregoing cause of action, these defendants acted with carelessness in imparting words

and facts upon which Mr. Sidorov was expected to rely and as a result of which Mr. Sidorov was damaged.

191.    These defendants had a duty to impart correct information, as they knew that such information was desired for a serious purpose, would be relied upon by Mr. Sidorov and would result in damage to him, if such information proved to be erroneous.

192.    Due to soliciting Mr. Sidorov's investment in Cloud Daddy and possessing unique and specialized expertise, knowledge and information upon that subject, defendants were in a relationship of trust and confidence with Mr. Sidorov and had a duty to use care in imparting accurate information.

193.    Due to imparting information to Mr. Sidorov of which they had special knowledge for purposes of soliciting his investment in Cloud Daddy, defendants also had a duty to disclose all material information pertaining to that subject matter.

194.    They failed to discharge that duty and imparted false information and/or failed to impart full and accurate information to Mr. Sidorov.

195.    Mr. Sidorov was damaged as a result of his reliance on the misrepresentations and/or omissions at issue, including by entering into the $252,000 investment at issue and through the further investment of substantial time, money and effort in the Cloud Daddy venture thereafter.

196.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in the minimum amount of $252,000 and a further amount to be proven at trial, plus associated interest.

197.    These defendants' conduct was gross, wanton and willful and exhibited a high degree of moral culpability which manifested a conscious disregard of the rights of others or was so reckless as to amount to such disregard.

198.     By reason of the foregoing, Mr. Sidorov is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### AGAINST DEFENDANT CLOUD DADDY
(Declaration that Round 2 Subscription Agreement
and Second Shareholders Agreement Are Void *Ab Initio* and Unenforceable)

199.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

200.     By reason of the facts alleged above and, in particular, of the foregoing two causes of action for fraudulent inducement and negligent misrepresentation, there exists an actual case or controversy as to the validity of the Round 2 Subscription Agreement and Second Shareholders Agreement.

201.     Resort to a mere breach of contract claim would not accord Mr. Sidorov the full relief to which he is entitled in this action because, *inter alia*, these agreements deprived Mr. Sidorov of significant rights he held under the Shareholders Agreement.

202.     By reason of the alleged above and, in particular, of the foregoing two causes of action for fraudulent inducement and negligent misrepresentation, Mr. Sidorov asks for a declaration that the Round 2 Subscription Agreement and the Second Shareholders Agreement are void *ab initio* and unenforceable against Mr. Sidorov, and he is relieved of any performance obligations pursuant thereto.

## SIXTH CAUSE OF ACTION
### AGAINST DEFENDANTS KONSTANTIN MALKOV, GARMAL,
### MAXIM SMETANNIKOV AND MVG, LLC
(Breach of Fiduciary Duties)

203.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

204.    As controlling and/or majority shareholders in and/or members of the Board of Cloud Daddy, Garmal, Mr. Malkov (including through Garmal), Mr. Smetannikov and his entity, MVG, LLC, through which he owned Cloud Daddy shares owed fiduciary duties to deal fairly with Mr. Sidorov as a minority shareholder in Cloud Daddy.

205.    Instead, Mr. Malkov, Garmal, Maxim Smetannikov and MVG, LLC operated Cloud Daddy in their own best interests by knowingly engaging in transactions that were substantially unfair to and substantially injured Mr. Sidorov as a minority shareholder in Cloud Daddy.

206.    Such transactions, included, without limitation, effecting substantial transfers of shares in Cloud Daddy to Garmal, MVG, LLC — and two other entities, AKRP, LLC and PKP, LLC, belonging, respectively, to Andrey Korepanov and Pavel Kotpev, two individuals who were members of Garmal, as well as Cloud Daddy developers retained by Mr. Malkov — for no consideration and/or in exchange for "sweat equity," failing to disclose such transactions to Mr. Sidorov at the relevant time, failing to secure his consent to such transactions and soliciting Mr. Sidorov's investment and diluting his interest in Cloud Daddy through the fraudulently executed Round 2 financing and the Kupfermans Transaction that was not properly disclosed to or voted on by Mr. Sidorov.

207.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in an amount to be proven at trial, plus associated interest, as well as punitive damages.

## SEVENTH CAUSE OF ACTION IN THE ALTERNATIVE
## AGAINST DEFENDANT CLOUD DADDY
### (Breach of Contract)

208.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

209.    To the extent that the Shareholders Agreement is held valid and enforceable, Mr. Sidorov alleges that Cloud Daddy repeatedly and materially breached the Shareholders Agreement in multiple respects.

210.    Among other possible breaches, Cloud Daddy breached:

a.  ¶1(b) by repeatedly failing to provide to Mr. Sidorov the financial reports required in that paragraph within the time frames specified in that paragraph;

b.  ¶1(c) by repeatedly resorting to evasion and other dilatory tactics to deny Mr. Sidorov his right to reasonable inspection of the company's books of account, records, reports and other papers and to discuss its affairs, finances and accounts with its officers, directors and employees;

c.  ¶2(b) by engaging, without unanimous Board approval, in acts of CEO appointment, interested-party transactions and contracts in excess of $100,000;

d.  ¶3(e) by failing to extend to Mr. Sidorov any notice and opportunity to exercise his right of first refusal with respect to Garmal's transfer of shares to other investors during the company's Round 2 financing;

e.  ¶3(f) by failing to give proper notice to Mr. Sidorov of the terms on which stock was issued to other investors during the company's Round 2 financing and in conjunction with the Kupfermans Transaction;

f.  ¶3(h) by failing to secure unanimous Board approval and the consent of all Round 1 participants including Mr. Sidorov to the Round 2 financing and Kupfermans Transaction; and

g.  ¶3(i) by failing to grant Mr. Sidorov shares sufficient to compensate him for the dilution suffered as a result of the subsequent Round 1 investment, by Mr.

Brazhnikov/YB Investments, LLC, at a lower per-share price than Mr. Sidorov's and as a result of the Round 2 financing and Kupfermans Transaction.

211.    Such breaches damaged Mr. Sidorov.

212.    By reason of the foregoing, to the extent its conduct is found to be neither expressly permitted nor forbidden by the terms of the Shareholders Agreement, Cloud Daddy breached the covenant of good faith and fair dealing implicit in every contract as a matter of law, insofar as its conduct deprived Mr. Sidorov of significant benefits to which he was entitled under the Shareholders Agreement.

213.    Mr. Sidorov has at all times performed pursuant to the Shareholders Agreement.

214.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in an amount to be proven at trial, plus associated interest.

## EIGHTH CAUSE OF ACTION
## AGAINST DEFENDANTS CLOUD DADDY, GARMAL AND YURIY KOZHYNOV
### (Breach of Contract)

215.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

216.    To the extent that the Shareholders Agreement is held valid and enforceable, Mr. Sidorov alleges that, as described in the foregoing cause of action, Cloud Daddy's numerous breaches of the Shareholders Agreement were material, and Mr. Sidorov, upon discovering those breaches, repeatedly gave the company written notice of such breaches.

217.    To the extent those breaches were capable of cure, they remained unremedied for a period of at least 30 days after written notice thereof.

218.    In accordance with ¶3(g) of the Shareholders Agreement, Mr. Sidorov, on June 14, 2021, gave written notice to Cloud Daddy and certain of the "Existing Investors" (as that

term is used in the agreement) of his exercise of the "Put Right" set forth in that paragraph and designated a date and time of June 30, 2021 at 12:00 p.m. for the purchase of his shares pursuant to ¶3(g

219.    In accordance with that provision, these parties were obligated "to purchase all of the Shares then held by Vasily Sidorov … for a purchase price payable in cash in an amount equal to the Vasily Sidorov Purchase Price Per Share."

220.    In an e-mail of June 16, 2021, however, Mr. Kelly advised Mr. Sidorov, on behalf of Cloud Daddy, that because the "Put Right" provision did not appear in the Second Shareholders Agreement, it no longer governed, and the company had no obligation to honor Mr. Sidorov's exercise of that right.

221.    Both Cloud Daddy and its "Existing Investors" failed to pay over Mr. Sidorov's purchase price on the designated date of June 30, 2021 or anytime thereafter.

222.    To the extent Garmal and Yuriy Kozhynov, as Existing Investors, may claim not to have executed the Shareholders Agreement or not to have executed it in their personal capacities, these parties are bound by its terms because they were aware of the Shareholders Agreement, accepted its benefits and knew Mr. Sidorov was acting in reliance on that agreement.

223.    Cloud Daddy, Garmal and Yuriy Kozhynov breached the Shareholders Agreement by refusing and failing, jointly and severally, to purchase Mr. Sidorov's shares in the Company, as required by ¶3(g).

224.    Mr. Sidorov has at all times performed pursuant to the Shareholders Agreement.

225.    By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in an amount to be proven at trial, plus associated interest.

NINTH CAUSE OF ACTION
AGAINST DEFENDANTS GARMAL AND YURIY KOZHYNOV
(Unjust Enrichment)

226.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

227.     To the extent Garmal and Yuriy Kozhynov are not held liable for their breach of the Shareholders Agreement's "Put Right" provision at ¶3(g) under the Eighth Cause of Action, they should be held liable for the same amount under the theory of unjust enrichment.

228.     Notably, they were aware of the Shareholder Agreement and its terms, were aware that Mr. Sidorov had executed the Shareholders Agreement and would be investing in Cloud Daddy in reliance thereon, had an interest in Cloud Daddy and benefitted at Mr. Sidorov's expense by securing his agreement to the transaction based on his understanding that "Other Shareholders," as defined in the Shareholders Agreement, were going to be made subject to that agreement and to material rights specified in that agreement, including, *inter alia*, its "Put Right" in ¶3(g), whereas, in fact, on information and belief, those Other Shareholders were never asked to execute the agreement.

229.     It is against equity and good conscience to permit these defendants to retain the benefit they received by virtue of Mr. Sidorov's investment in Cloud Daddy, and these defendants should be required to return the amount of that investment to Mr. Sidorov.

230.     By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in an amount to be proven at trial, plus associated interest.

TENTH CAUSE OF ACTION IN THE ALTERNATIVE
AGAINST DEFENDANT CLOUD DADDY
(Breach of Contract)

231.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

232.    To the extent the Second Shareholders Agreement is held valid and enforceable, Mr. Sidorov alleges that Cloud Daddy repeatedly and materially breached the Second Shareholders Agreement in multiple respects.

233.    Among other possible breaches, Cloud Daddy breached:

a.    ¶1(c) by repeatedly failing to provide to Mr. Sidorov the financial reports required in that paragraph within the time frames specified in that paragraph;

b.    ¶1(d) by repeatedly resorting to evasion and other dilatory tactics to deny Mr. Sidorov his right to reasonable inspection of the company's books of account, records, reports and other papers and to discuss its affairs, finances and accounts with its officers, directors and employees;

c.    ¶1(f), which required Mr. Malkov to be involved with the company on a full-time basis by January 1, 2020, and which never happened;

234.    Such breaches damaged Mr. Sidorov.

235.    By reason of the foregoing, to the extent its conduct is found to be neither expressly permitted nor forbidden by the terms of the Second Shareholders Agreement, Cloud Daddy breached the covenant of good faith and fair dealing implicit in every contract as a matter of law, insofar as its conduct deprived Mr. Sidorov of significant benefits to which he was entitled under the Second Shareholders Agreement.

236.    Mr. Sidorov has at all times performed pursuant to the Second Shareholders Agreement.

237.     By reason of the foregoing, Mr. Sidorov is entitled to compensatory damages in an amount to be proven at trial, plus associated interest.

ELEVENTH CAUSE OF ACTION IN THE ALTERNATIVE
AGAINST DEFENDANT CLOUD DADDY
(Specific Performance)

238.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

239.     To the extent the Shareholders Agreement is held valid and enforceable, Mr. Sidorov is entitled to be awarded additional shares under the terms of that agreement's ¶5(a).

240.     Specifically, as described above, Mr. Sidorov's interest in Cloud Daddy was diluted within the meaning of ¶5(a) as a result of Cloud Daddy's sale of securities to YB Investments, LLC in January 2018 at a per-share price lower than Mr. Sidorov's purchase price.

241.     As further described above, Mr. Sidorov's interest in Cloud Daddy was further diluted within the meaning of ¶5(a) as a result of the sale of securities to the Kupfermans in April-May 2018 at a per-share price lower than Mr. Sidorov's purchase price.

242.     Pursuant to Shareholders Agreement ¶8(h), the foregoing breach automatically constitutes irreparable harm not compensable by monetary damages and entitling Mr. Sidorov to specific performance.

243.     Mr. Sidorov substantially performed his contractual obligations and was willing and able to perform his remaining obligations.

244.     By reason of the foregoing, Mr. Sidorov is entitled to specific performance of Cloud Daddy's obligation under ¶5(a) to award him additional shares in Cloud Daddy in an amount to be determined at trial.

TWELFTH CAUSE OF ACTION IN THE ALTERNATIVE
AGAINST DEFENDANT GARMAL
(Specific Performance)

245.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth here.

246.    To the extent the Second Shareholders Agreement is held valid and enforceable, Mr. Sidorov is entitled to be awarded additional shares under the terms of that agreement's ¶1(f).

247.    Specifically, because Mr. Malkov failed to comply with his contractual obligation under ¶1(f) to become a full-time employee of Cloud Daddy, within the meaning of that provision, by January 1, 2020, pursuant to ¶1(f), Mr. Sidorov is entitled to "receive from Garmal, without consideration, an amount of shares of Common Stock of [Cloud Daddy] equal to the total amount of shares of Common Stock then owned by [Mr. Sidorov] multiplied by the percentage that is achieved by dividing 9,079 by the total number of shares of Common Stock then outstanding."

248.    Pursuant to Second Shareholders Agreement ¶7(h), the foregoing breach automatically constitutes irreparable harm not compensable by monetary damages and entitling Mr. Sidorov to specific performance.

249.    Mr. Sidorov substantially performed his contractual obligations and was willing and able to perform his remaining obligations.

250.    By reason of the foregoing, Mr. Sidorov is entitled to specific performance of Garmal's obligation under ¶1(f) to award him additional shares in Cloud Daddy in an amount to be determined at trial.

PRAYER FOR RELIEF

WHEREFORE, plaintiff Vasily Sidorov demands that judgment be entered in his favor and against defendants as follows:

1.      on the first cause of action, ordering Cloud Daddy, Konstantin Malkov and Maxim Smetannikov to pay money damages in the minimum amount of $200,000 and a further amount to be proven at trial, plus associated interest and punitive damages in an amount to be determined at trial;

2.      on the second cause of action, ordering Cloud Daddy, Konstantin Malkov and Maxim Smetannikov to pay money damages in the minimum amount of $200,000 and a further amount to be proven at trial, plus associated interest and punitive damages in an amount to be determined at trial;

3.      on the third cause of action, ordering Cloud Daddy, Konstantin Malkov and John Kelly to pay money damages in the minimum amount of $252,000 and a further amount to be proven at trial, plus associated interest and punitive damages in an amount to be determined at trial;

4.      on the fourth cause of action, ordering Cloud Daddy, Konstantin Malkov and John Kelly to pay money damages in the minimum amount of $252,000 and a further amount to be proven at trial, plus associated interest and punitive damages in an amount to be determined at trial;

5.      on the fifth cause of action, declaring that the Round 2 Subscription Agreement and Second Shareholders Agreement are void *ab initio* and unenforceable against Mr. Sidorov;

6.      on the sixth cause of action, ordering Konstantin Malkov, Garmal, Maxim Smetannikov and MVG, LLC to pay money damages in an amount to be proven at trial, plus associated interest, and punitive damages in an amount to be determined at trial;

7.      on the seventh cause of action, ordering Cloud Daddy to pay money damages in an amount to be proven at trial, plus associated interest;

8.      on the eighth cause of action, ordering Cloud Daddy, Garmal and Yuriy Kozhynov to pay money damages in an amount to be proven at trial, plus associated interest;

9.      on the ninth cause of action, ordering Garmal and Yuriy Kozhynov to pay money damages in an amount to be proven at trial, plus associated interest;

10.     on the tenth cause of action, ordering Cloud Daddy to pay money damages in an amount to be proven at trial, plus associated interest;

11.     on the eleventh cause of action, ordering Cloud Daddy to award to Mr. Sidorov an additional number of shares in Cloud Daddy to be determined at trial;

12.     on the twelfth cause of action, ordering Garmal to award to Mr. Sidorov an additional number of shares in Cloud Daddy to be determined at trial;

13.     for the fees and costs incurred in connection with this action;

14.     and ordering such other and further relief for Mr. Sidorov and against defendants as this Court deems just and proper.

Dated:   New York, New York
         July 20, 2021

                                        SCAROLA ZUBATOV SCHAFFZIN PLLC

                                        By_____
                                            Alexander Zubatov
                                        *Attorneys for Vasily Sidorov*
                                        1700 Broadway
                                        41st Floor
                                        New York, NY  10019
                                        Tel.:  (212) 757-0007